**In the Interest of R.N.**

**R.N., Respondent and Appellant.**

**Civ. 900128.**

Supreme Court of North Dakota.

April 12, 1990.

Gregory Ian Runge (argued), Bismarck, for respondent and appellant.

Wayne D. Goter (argued), Asst. States Atty., Mandan, for appellee.

ERICKSTAD, Chief Justice.

R.N. appeals from an order of the Burleigh County Court committing her to the North Dakota State Hospital for 90 days to receive treatment for mental illness. We affirm.

R.N.'s daughter initiated a petition for involuntary commitment on January 29, 1990. The petition stated that R.N. was believed to be mentally ill because she had been diagnosed as suffering from bipolar manic depression and because she was seen "standing at an open second story window with her mouth taped shut." The petition also alleged that R.N. has been "disposing of her property and she has in essence told me and others that we would soon be seeing her for the last time," and that R.N. "was picked up by a Morton County Deputy Sheriff because she was in her car along the highway south of Mandan, ND and in a state of complete disorientation." The petition further recites that "[u]nless [R.N.] receives immediate treatment, she will suffer a substantial deterioration in physical health. She has diabetes and high blood pressure but does nothing to take care of these problems. There is also a substantial

likelihood that [R.N.] will suffer a substantial deterioration in mental health which would be dangerous to her health because she appears to be contemplating suicide while her mental health appears to be worsening."

On January 30, 1990, the Honorable Judge Thomas J. Schneider ordered R.N. detained at the North Dakota State Hospital for emergency treatment until February 2, 1990, the date of the preliminary hearing. After the preliminary hearing, the county court ordered R.N. confined at MedCenter One in Bismarck, or if MedCenter One would not accept her that she be confined at the State Hospital in Jamestown for treatment for a period of thirteen days. A treatment hearing was scheduled for February 14, 1990.

Following the treatment hearing, the county court ordered that R.N. be committed to the State Hospital for a period of 90 days. The county court found that R.N. is a person requiring treatment because she is mentally ill and, without treatment, the court said:

"[T]here exists a serious risk of harm to self, others, or property and a substantial likelihood of:

\* \* \* \* \* \*

x Substantial deterioration in physical health, or substantial injury, disease, or death resulting from poor self-control or judgment in providing one's shelter, nutrition or personal care;

x Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

R.N. filed an expedited appeal.

On appeal, R.N. argues that the evidence presented at trial did not clearly and convincingly show that she was a "person requiring treatment," pursuant to section 25–03.1–02, N.D.C.C.

■ This Court's review in involuntary commitment cases is limited to an examination of the procedures, findings, and conclusions of the lower court. Section 25–03.-1–29, N.D.C.C.; *Kottke v. U.A.M.*, 446 N.W.2d 23, 26 (N.D.1989); *In re Riedel*, 353 N.W.2d 773, 775 (N.D.1984). A majority of our Court has expressed the view that the trial court's determination of whether there is clear and convincing evidence that the respondent is a person requiring treatment is a finding of fact which will not be set aside on appeal unless it is clearly erroneous under Rule 52(a), N.D.R.Civ.P. *E.g., U.A.M., supra.* The petitioner for an involuntary admission must prove by clear and convincing evidence that the respondent is a person requiring treatment. Section 25–03.1–19, N.D.C.C.; *O'Callaghan v. L.B.*, 447 N.W.2d 326, 327 (N.D.1989). Our law also provides a presumption that the respondent does not require treatment. *See* section 25–03.1–19, N.D.C.C.; *In re Kupperion*, 331 N.W.2d 22, 26 (N.D.1983).

Section 25–03.1–02(10), N.D.C.C., which defines "person requiring treatment" and "serious risk of harm" reads as follows:

"10. 'Person requiring treatment' means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property. 'Serious risk of harm' means a substantial likelihood of:

a. Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

c. Substantial deterioration in physical health, or substantial injury, disease, or death based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or pat-

terns in the person's treatment history, current condition, and other relevant factors."

The county court's finding that R.N. is a person requiring treatment is based on subsections (c) and (d) of section 25–03.1–02(10). Therefore, the evidence must clearly and convincingly show that there is a substantial likelihood of substantial deterioration in the physical health of R.N. and/or a substantial likelihood of substantial deterioration in the mental health of R.N. which would predictably result in dangerousness to herself, others, or property.

This is the second time that R.N. has appealed an order of commitment to this Court. In *In re R.N.*, 450 N.W.2d 758 (N.D.1990) (hereinafter *R.N. I*), this Court reversed R.N.'s commitment to the State Hospital. In *R.N. I*, R.N. was found by the trial court to be a person requiring treatment based on subsections (a) and (c) of section 25–03.1–02(10). We held that the medical testimony and the record as a whole did not support by clear and convincing evidence the trial court's finding that R.N. was a person requiring treatment. We concluded that the record at best led only to the conclusion that R.N. was a person who would benefit from treatment and not that she was a person who required treatment pursuant to the statute.

While the facts in this case are somewhat similar to the facts in *R.N. I*, we must look to the medical testimony and the record as a whole in the instant case to determine if the county court's finding that R.N. is a person requiring treatment is supported by clear and convincing evidence. Because the county court relied on subsections (c) and (d) of section 25–03.1–02(10), N.D.C.C., we must determine whether or not R.N. is a person requiring treatment under the terms of those subsections.

The allegations in the petition were substantiated by the testimony of Officer Jim Foley of the Morton County Sheriff's Department and the petitioner, R.N.'s daughter, N.S. Officer Foley testified that at approximately 11:50 p.m. on January 28, 1990, he was dispatched to a location near the State Park south of Mandan. The dispatch stated that there had been a report of a possible stranded motorist flagging down cars. Upon arrival, Foley testified that he found R.N. parked on an overlook and "sitting in the driver's seat with her head against the horn activating the horn on the vehicle." He said that she appeared "confused" and was chanting prayers. He offered to give her a ride because he was concerned about her driving a vehicle in that condition.

N.S. testified to the following incidents which led to the filing of the petition:

"A I guess the real incident that got me to do it was when she was at the State Park flagging down vehicles. It was dark and she hadn't been in her right mind and that is a very dangerous road, especially to be driving in her state of mind.

\* \* \* \* \* \*

"Q Did it appear to you that she was contemplating suicide?

"A It did at one point, yes. At several points I guess. When she went out to my father-in-law's house and told him that—to make sure that if she's not around to 'take care of my daughter N. and my grandchildren.' And she also stated to me that, 'I'd like you to tweeze my eyebrow one last time,' and I took it as a suicide. Also, when I caught her upstairs standing before an open window looking out with duct tape across her mouth. Those are the incidents that led me to believe that she was thinking of suicide."

At the treatment hearing, the petitioner relied primarily upon the testimony of Dr. William Pryatel, a psychiatrist at the North Dakota State Hospital, and Dr. Robert Gulkin, a psychologist at South Central Human Service Center. Dr. Pryatel indicated a concern about a deterioration in R.N.'s physical health due to her mental illness. He also indicated that R.N. poses a danger to others when she drives a motor vehicle in her manic condition. The following testimony was given by Dr. Pryatel in response to specific questioning as to the rationale for his findings:

"Q But you did check Box Number 2 or killing or inflicting serious bodily harm on another person. Now, what do you base that on?

"A I base it on that she drives a motor vehicle when she's in a manic state and could—you know, could possibly be dangerous with the motor vehicle.

"Q Okay. All right. And what do you then base Box 3–A on, substantial deterioration of physical health?

"A Well, I base it on that there at the ward she seemed to have poor judgment about her diet, she eats candy and she doesn't want to stay on the diabetic diet, she's up at night, when she's in a very manic state she doesn't get much sleep, she has a very drugged quality, she's constantly on the go, on the go, runs her down to the point that she is just dragging sometimes and then just collapses practically like in bed or something and will run herself down that way by being up at night and being constantly on the go."

Upon further examination by the court, the following testimony was given by Dr. Pryatel:

*"BY THE COURT:*

"Q You mentioned something about benefiting from medication and saying about going to the hospital and staying in the hospital, and she could benefit from medication. Are you saying that she requires to be at the hospital—

"A Yes.

"Q —to benefit from this medication? Why is that? Requiring is one thing. Benefiting is another.

"A Right. Well, I don't think that R. really has—first of all, I don't think she's in remission enough to take care of herself so that she could be discharged. She still has mood swings and has irritable moods, poor judgment, and we have to kind of not force her to take the medication but insure that she takes the medication. We even have to have her open her mouth and prove to the nurse that she's been taking her medication, and I felt that if she was discharged from the hospital, she would quit taking her medication and she—whatever remission she was in right now, she would regress back to the state she was in previously and all the benefit would be lost and like—you know, like that.

"Q So basically you're telling me that she needs monitoring at this time?

"A She needs very close monitoring. We need to make sure that she's taking the medication and, you know, to—make sure that she's taking care of herself and so on, needs to be in a very structured situation in my opinion, a hospital."

Dr. Gulkin testified that he had concerns about R.N.'s physical well-being because of her manic disorder. While not necessarily an immediate threat, he testified that her manic disorder is a very real and a very significant factor affecting her physical health if it is untreated. Dr. Gulkin also indicated that R.N.'s condition results in dangerousness to others. He testified that her reaction to any number of stresses would be unpredictable and he had some concerns about her ability to use good judgment. He testified that:

"I think that she needs a structured residential type of placement at this time. I think it's the only way to provide the structure and supervision that she needs. It's the only way that she will get the medical care she needs including the supervision of her taking the medication."

While Dr. Pryatel testified that R.N.'s diabetes and blood pressure are not at such a point where they require medication, he did express a concern about R.N.'s health if the diabetes went untreated. As stated above, both doctors believe that R.N. needs a structured residential type of placement to ensure that she takes the medication prescribed because of her mental illness. Dr. Pryatel also testified that "there's a report that she, you know, has—drives a car, a motor vehicle in her present state which I think is very dangerous and it could present a danger to the community."

Although R.N., through her brief and oral argument of counsel, offers alternative explanations and rationalizations for her behavior, there is no expert testimony in the record which contradicts the testimo-

ny of Dr. Pryatel and Dr. Gulkin. The only testimony in R.N.'s behalf at the treatment hearing was that of R.N. herself. She testified that she just wanted to go home, that she wanted to be free. She also testified that she would not take her medication.

■ While a court is not required to accept the testimony of expert witnesses as conclusive, and has the right to judge the credibility of those witnesses, if there is no contrary expert testimony in the record, the reason for disregarding the expert testimony should be explained. *Kottke v. U.A.M., supra,* 446 N.W.2d at 27. Although the basis for the medical conclusions of Dr. Pryatel and Dr. Gulkin may be challenged, we are not convinced that the county court erred in accepting the testimony and conclusions of the expert witnesses. As the nonmedical facts alleged in the petition precipitating the preliminary hearing and the commitment hearing were supported by testimony of witnesses, and the medical facts were supported by the expert witnesses as previously discussed, we believe the evidence supports the treatment order.

The testimony of Dr. Pryatel and Dr. Gulkin that R.N. is mentally ill and poses a serious risk of harm to herself and others if not hospitalized justifies the county court's finding, by clear and convincing evidence, that R.N. is a person requiring treatment.

Alternative treatment options were discussed at the treatment hearing. The findings by the county court which reflect the underlying basis for the court's determination that the least restrictive alternative for the treatment of R.N. was inpatient treatment at the State Hospital are as follows:

"Refusal to comply with treatment and refusal to take medication will result in further deterioration of physical and mental health. Hospitalization is necessary at this time to provide structure, monitoring of medication stabilization, accountability and therapeutic intervention."

These findings are supported by clear and convincing evidence and they are sure-

ly not clearly erroneous. Accordingly, the order of the county court requiring R.N. to be hospitalized and treated for mental illness at the North Dakota State Hospital for a period not to exceed 90 days is affirmed.

GIERKE, J., and VERNON R. PEDERSON, Surrogate Judge, concur.

MESCHKE, J., concurs in the result.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of VANDE WALLE, J., disqualified.

LEVINE, Justice, specially concurring.

In *R.N. I* [450 N.W.2d 758 (N.D.1990)], we held there was insufficient evidence to support the trial court's findings that R.N. was substantially likely to commit suicide and to suffer substantial deterioration in her physical health. In the present case, the trial court did not find R.N. to be suicidal. It did find a substantial likelihood of deterioration in her physical health as well as in her mental health. I agree with the majority that the evidence as to each of these findings is clear and convincing. I, therefore, concur in affirming the determination of the trial court that R.N. is a person requiring treatment.

In *R.N. I,* there was no evidence of any deterioration in R.N.'s physical health and the only evidence about prospective deterioration in her physical health was elicited in response to a hypothetical question. However, there was no evidence that R.N. had or would engage in the hypothetical conduct. Indeed, the expert opinion was that R.N. took good care of herself.

In this case, there is ample testimony that R.N. was not eating, sleeping or dressing properly. Dr. Gulkin explained that not sleeping and not eating properly were characteristic of manics and that a tendency not to take care of oneself is a product of mental illness. Dr. Pryatel, like Dr. Gulkin, was not concerned about R.N.'s diabetes and hypertension, rather he was disturbed over R.N.'s poor judgment about diet, sleeplessness, constant activity and resultant exhaustion. Both experts rested their conclusions about R.N.'s physical health on her aberrant eating, sleeping and behavioral patterns. These patterns were

characterized as manifestations of her mental disorder. The doctors testified that R.N.'s mental disorder needs treatment in order to avoid causing further substantial deterioration in R.N.'s physical condition.

R.N. continues to resist taking medication. In *R.N. I,* the tenor of the medical testimony was that R.N. would benefit from medication. We concluded that that was insufficient to establish that R.N. posed a serious risk of harm to self. In this case, the experts testified that R.N.'s mental condition would deteriorate without medication and that she would be unable to care for herself because of the exacerbation of her mental disorder without medication. There was also abundant testimony and emphasis in this case on the danger to R.N. and others posed by her driving a vehicle.

I am not sure whether the record in this case is so more developed than the record in *R.N. I* because greater care was taken or because R.N.'s condition has, in fact, changed. Following *R.N. I,* R.N.'s husband was hospitalized. R.N.'s daughter testified that R.N.'s condition has deteriorated since that hospitalization. In either event, I am satisfied that the trial court relied on clear and convincing evidence in finding that R.N. is a person requiring treatment. I therefore concur in affirming the order of commitment.